Ann ENGMAN, Walter Engman, by and through his next friend, Ann Engman, Nora Engman, by and through her next friend, Ann Engman, Appellants,

v.

SOUTHWESTERN BELL TELEPHONE COMPANY, Respondent.

No. WD 32120.

Missouri Court of Appeals,
Western District.

March 16, 1982.

Tom B. Kretsinger, Liberty, for appellants; Kretsinger & Kretsinger, Liberty, of counsel.

Thomas E. Allen, Liberty, John W. Kelly, Jr., James E. Taylor, Kansas City, for respondent; Jack C. Lorenz, St. Louis, of counsel.

Before TURNAGE, P. J., and PRITCHARD and CLARK, JJ.

PRITCHARD, Judge.

By the verdict of a jury, respondent, Bell, was exonerated from claimed liability for invasion of appellants' right of privacy in the removal of telephones from their home in Liberty, Missouri. In a former appeal, *Engman v. Southwestern Bell Tel. Co.*, 591 S.W.2d 78 (Mo.App.1979), it was held that summary judgment was improperly granted Bell on the Engmans' allegations that there was an unreasonable (willful and wanton) intrusion upon their seclusion, and that a tariff of the Public Service Commission, although a defense to a claim of negligent entry of premises, was not a defense to a claim of willful and wanton conduct.

Bell attacks appellants' Point I as being in violation of Rule 81.08(a) for failure to attach to the notice of appeal a copy of the judgment appealed from; for improperly appealing from the order overruling the motion for new trial (instead of from the final judgment); and for the reason that the point is an abstract statement of the law presenting nothing for review under Rule 84.04(d). Apparently, the error of omission of a copy of the judgment was cured at the initiation of the Clerk of the Circuit Court of Clay County four days after the notice of appeal. The appeal from the order overruling the motion for new trial was amended to state that it was an appeal from the judgment. It is clear from appellants' entire brief what they are contending as error in the giving of instructions, and Point I and Point II will, therefore, be considered together.

Point I asserts that the trial court erred in giving Instruction Nos. 11, 17, 23 and 29, because they contain defenses to appellants' claims that are contrary to Missouri law regarding invasion of privacy. Paraphrased, each of these instructions, directing verdicts for Bell, as to each appellant, submitted that Ann Engman's telephone service was terminated for nonpayment of charges; that after the termination Bell's employee entered her premises for the purpose of removing its telephone instruments; and "Third, the manner and time of defendant's employee's entry into said premises

was reasonable." The verdict directing instructions for all appellants simply submit that Bell's employee, Singleton, intentionally entered the Engman apartment and "such entry was without plaintiffs' permission," and each references defense instructions (reasonable entry, supra) and others submitting consent to the acts of defendant and the reasonable consequences thereof.

Point II is that the court erred in giving Instruction Nos. 10, 16 and 22, which submitted the defense that "Ann Engman, by words or conduct, consented to the acts of defendant and the reasonable consequences thereof."

In *Corcoran v. Southwestern Bell Tel. Co.*, 572 S.W.2d 212, 215[6] (Mo.App.1978), as to the claim against defendant, Georganne Corcoran, for invasion of privacy, the court stated the three elements necessary to make a submissible case: "(1) the existence of a secret and private subject matter; (2) a right possessed by plaintiff to keep that subject matter private; and (3) the obtaining of information about that subject matter by defendant through *some method objectionable to the reasonable man*." (Emphasis added.) In *Gonzales v. Southwestern Bell Telephone Company*, 555 S.W.2d 219 (Tex.Civ.App.1977), cited in the first *Engman* appeal, supra, the court held that the entry of a Bell employee into private residence *without permission* to remove telephones was a willful tort of invasion of privacy. Of course, if it was done without permission, then it would be objectionable to the reasonable man, and if it was done with permission, that element would be a defense to the intrusion to be determined by the jury on its evaluation of the facts.

Appellants argue that the first *Engman* appeal, supra, established as a matter of law that they were entitled to recover merely upon proof that Bell's employee entered the Engman premises intentionally and without permission. That is not the *Engman*, supra, holding—which was simply that there remained a genuine issue of fact as to a willful entry under the pleadings. Appellants' instructions did not submit for a finding that the entry was unreasonable,

nor that there were any damages flowing from the entry. Bell was entitled to a submission that the entry into the premises was reasonable, i.e. that there was permission or consent, under the converse instructions of MAI 33.00 et seq.—that third method (MAI 33.05) of conversing using an affirmative, here consent to converse the submitted lack of permission, and generally, in separate instructions, the issue of reasonableness. Bell's evidence to support the giving of its defensive instructions is this, and is sufficient, viewed in its light most favorable to it: Bell's employees made numerous attempts to contact Ann Engman by telephone, but she did not return the calls. Bell sent her an advance written notice that the telephones would be removed on April 7, 1975; Ann Engman admitted receiving that notice but denied that it advised her of the date the telephones would be removed. On that date, Nora Engman, age 11, was home ill with a strep throat. Ann Engman had previously requested the apartment manager to grant Bell's employees access to her apartment during her absences. The manager had a key, and did open the apartment, after which Bell's employee encountered Nora inside, identified himself, and told her his purpose was to remove telephones. She replied "Okay" or "All right" and directed him to the bedroom telephone. Then, in 1977, Ann Engman was again having difficulty paying her bills, and she admitted receiving a notice that Bell's employees would come to her apartment on May 12, 1977, on which date she went to work leaving her 20 year old son, Walter, in charge of the apartment. Walter testified that he was in bed asleep and the front door was unlocked, and the first he knew of any intruder was when a man tapped him on the foot. Bell's employee, Singleton, gave this version: He knocked on the door twice, and a lady across the hall opened her door, thinking someone was knocking on her door. Singleton asked her if the Engmans lived in the apartment across from her and she indicated they did. He continued to knock and heard a young man say, "Who is it". He said, "It's the telephone man". The young man said, "What do you want?",

and Singleton answered, "I'm supposed to take out a couple of phones today", to which the young man answered, "Well, the door's unlocked. Come in." Singleton unsnapped the living room telephone, proceeded to the bedroom finding Walter sleepy, but awake, and he pointed to the other bedroom where the other telephone was, and asked him, "Don't you feel good today?". Walter answered, "No, I'm looking for a job." According to Singleton, this hit him in the wrong manner and he said, "Buddy, if you find one there, let me know —I'd like to have it." Singleton then took the second telephone and left the apartment.

The assistant apartment manager testified that telephone company installers frequently came to her to gain entry to tenants' apartments. Singleton asked her on April 7, 1975, to let him in to the Engman apartment because no one answered the door. She went with him, knocked and received no answer, unlocked the door and yelled, "Manager—anyone here", two or three times. Singleton also yelled, "Phone man, phone man", and went inside to remove the phone, and went into the bedroom to remove the extension telephone. On returning, he said, "That's funny, there was someone in bed. They didn't answer the door." The manager could see Singleton at all times except when he went into the bedroom for about "two seconds, really". The manager testified further that it was customary for tenants to call in when someone was to be admitted to an apartment, and it was the common practice of the manager to grant telephone installers access to tenants' premises, as an accommodation to the tenants, and "Q Okay. Mrs. Engman didn't write out—or, call in and have you write out any orders, did she? A What's that—to remove the telephones? Q To remove the telephones. A No, she didn't. But, like I said, I, you know, had permission to take them in—so I had no reason to believe I didn't have permission for him to take them out."

It is clear from the evidence, as the jury could find, that the twenty year old son, Walter Engman, expressly granted Bell's employee permission to enter the unlocked door for the purpose of removing the telephones on May 12, 1977. The evidence is not so positive as to the April 7, 1975, entry. That must depend, first, upon whether Ann Engman gave an implied consent for entry into the apartment by telephone personnel to the apartment manager. The jury could find from the testimony of the apartment manager that such a consent existed for the installation of telephones and continued for the purposes of removal [such as, for instance, where the tenant of the apartment requested removal, and was absent when the employee came to remove the units]. This could raise an issue of reasonableness under the evidence for the jury to determine. Additionally, the eleven year old daughter, Nora, was present in the apartment when the manager unlocked the door for Singleton. He announced his purpose to remove the telephones, to which Nora assented and directed him to the bedroom telephone. Nothing unreasonable, as a matter of law, was shown to exist by that encounter—all of the evidence showed that Singleton was polite, and was in the apartment less than five minutes. The ultimate fact of reasonableness was for the jury, in connection with its determination of whether there was permission and consent to enter the apartment, which are interchangeable terms. Webster's Third International Dictionary. Note the case of *Rawls v. Conde Nast Publications, Inc.*, 446 F.2d 313, 317–318 (5th Cir. 1971), cert. den. 404 U.S. 1038, 92 S.Ct. 712, 30 L.Ed.2d 730, rehearing den. 405 U.S. 969, 92 S.Ct. 1167, 31 L.Ed.2d 244, and the quotes from Harper and James, The Law of Torts, Sec. 1.11, p. 38, " 'Frequently, perhaps more often than otherwise, the consent will be implied rather than expressed. Consent may be implied from custom, local or general, from usage or from the conduct of the parties, or some relationship between them' "; and Prosser, Law of Torts, 3rd Ed. 1964, Sec. 112, page 850, " 'Chief among the other defenses available in a privacy action is that the plaintiff's consent to the invasion, which will bar his recovery as in the case of any

other tort * * * '." Contrast the facts here with those in *Gonzales v. Southwestern Bell Telephone Company*, 555 S.W.2d 219 (Tex. Civ.App.1977), where Bell's employee, without any semblance of permission, as the jury there must have found, went to plaintiff's home, with no one present therein, broke a screen door lock, tracked mud into the house, and removed telephones. The verdict of the jury was there reinstated by the appellate court. Bell's instructions here, consent-meeting the appellants' submissions of entry without permission, and reasonableness of entry-meeting the ultimate issue under the *Corcoran* case, supra, of an entry "objectionable to the reasonable man", although not here approved as to form, were not in error.

Some mention should be made of appellants' argument that Bell's reading of the tariff set forth in the original *Engman* opinion, supra, there held not to be a defense to a claim for a willful invasion of privacy, could not be a defense here. That is true, but as set forth above, there was other evidence for the jury to weigh, of consent and reasonableness. No other issue is presented as to the admission into evidence of the tariff.

By their last point, appellants present under the plain error rule [for the first time in their amended brief], Bell's argument to the effect that every person who subscribes to telephone service would have to pay for the extra time and work for the retrieval of telephones where bills were not paid, and would absorb Bell's costs if it had to file a lawsuit and go to court. There was a general objection, with no grounds stated, to the argument, and the trial court did not rule on the objection. Bell's argument was retaliatory in some respects to that of appellants which sought to appeal to the jury's self-interest, and to personalize the claim of appellants. Paraphrased, that argument was: to punish Bell and deter it and others from committing the same violation of *your* rights; the sanctuary of *your* home; the audacity of anyone going into *your* home and taking anything without a resort to the courts of law; if *you* were in a lawsuit with a fellow who did the same thing and *you* had the same problem in front of *you* and his net worth was a thousand dollars, it wouldn't take much to punish him; there's no competition for Bell, *you* go to it or *you* don't get a telephone; this is a matter of *our* rights, *our* freedom, *our* liberty and *our* independence; and put *yourself* in the position, too, you know, because it's *your* rights too. Appellants also argued that it would have been easy to contact Mrs. Engman for an appointment to remove the telephones, to which Bell responded (in accordance with the evidence) of extended efforts to contact her, all unsuccessful. The reference by Bell as to subscribers paying the costs and absorbing them was but an isolated statement, upon which the trial court did not interfere, having opportunity to observe its prejudicial effect, if any. *Hensic v. Afshari Enterprises, Inc.*, 599 S.W.2d 522, 525 (Mo.App.1980). Point III is overruled.

The judgment is affirmed.

All concur.